IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Deborah D. Blocker,** | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action no. 2:11-cv-187** |
| | : | |
| **v.** | : | **Jury Trial Demanded** |
| | : | |
| **Port Authority of Allegheny** | : | **Judge Gary L. Lancaster** |
| **County, PA** and **Willie J. Dillard** | : | |
| **Tawnya Moore-McGee, Monica** | : | |
| **Johnson, Brenda Gacika, David** | : | |
| **DeAngelis, Towanna Gatewood,** | : | |
| **Rick Klavon** and **Eric Wells,** | : | |
| individually and in their official | : | |
| capacities, Defendants. | : | |

## VERIFIED AMENDED COMPLAINT

**AND NOW,** comes the Plaintiff, Deborah D. Blocker, by and through her

attorneys, **ROBINSON & GERALDO,** by Tiffany L. Robinson, Esq., brings forth

this Complaint against Defendants, and avers as follows:

### NATURE OF THE ACTION, PARTIES, JURISDCTION AND VENUE

1.    This is an individual action under the Civil Rights Act of 1866, 42 U.S.C. §

1981and 1983; Title VII of the Civil Rights Act of 1964, § 2000e et seq, and the

Pennsylvania Human Relations Act ("PHRA"), as amended, 43 Pa.C.S.A. § 951,

et.seq, and intentional infliction of emotional distress for illegal employment

practices and violation of Plaintiff, Deborah Blocker's ("Blocker") federal and state civil rights.

2.      Plaintiff, Deborah D. Blocker ("Blocker") is an African-American female adult currently residing in Turtle Creek, Allegheny County, Pennsylvania.

3.      Defendant, Port Authority Allegheny County (hereafter "Port Authority"), is a Port Authority created under the Second Class County Port Authority Act, 53 P.S. § 557, has had its headquarters at the Heinz Building, 345 Sixth Avenue, Pittsburgh, PA 15222, and conducts business throughout Pittsburgh and Allegheny County, PA.  Allegheny County, Pennsylvania owns the Port Authority.

4.      Defendant, Tawnya Moore-McGee ("Moore-McGee") has, at all relevant time, been employed by the Port Authority as the Assistant General Manager of Human Resources.   As the Assistant General Manager of Human Resources, Moore-McGee supervises all employees at the Port Authority's East Liberty Garage.

5.      Defendant, Willie J. Dillard ("Dillard) has, at all relevant time, been employed by the Port Authority as a Police Officer.

6.      Defendant, Monica Johnson ("Johnson") has, at all relevant time, been employed by the Port Authority as the Assistant Director of Operations at the East Liberty Garage.

7. Defendant, Eric Wells ("Wells") has, at all relevant time, been employed by the Port Authority as the Director of Employee Relations.

8. Defendant, Dave DeAngelis ("DeAngelis") has, at all relevant time, been employed by the Port Authority as the Assistant Manager of Maintenance of the East Liberty Garage.

9. Defendant, Towanna Gatewood ("Gatewood") has, at all relevant time, been employed by the Port Authority as the Director of the East Liberty Garage.

10. Defendant, Rick Klavon ("Klavon") has, at all relevant time, been employed by the Port Authority as the Manager of Maintenance of the East Liberty Garage.

11. Defendant, Brenda Gazica ("Gazica") has, at all relevant time, been employed by the Port Authority as the East Liberty Garage Employee Relations Representative. Wells supervises Gazica.

12. At all relevant time, Defendants have been subject to the prohibitions against race discrimination and retaliation in §1981, §1983, Title VII and the PHRA.

13. This court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions raising federal question), 42 U.S.C. § 2000e-2 (Title VII actions); 42 U.S.C. § 1981 (providing for equal rights under federal law); 42 U.S.C. § 1343 (actions arising under acts of Congress providing for protection of civil rights); and 42 U.S.C. § 1983.

14.    This matter is ripe for adjudication before this Court because Blocker exhausted her administrative remedies by filing with the Pennsylvania Human Relations Commission ("PHRC") and Equal Employment Opportunity Commission ("EEOC") within the respective statutory periods (180 days) three complaints (PHRC Case No. 200705287/EEOC No. 17F200862186, PHRC Case No. 200703631/EEOC No. 17F200861264 and PHRC Case No. 200806477/EEOC No. 17F200962656) following the complained of acts in this complaint.

15.    Pendent jurisdiction to hear state law claims is conferred by 28 U.S.C. § 1367.

16.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because at least one of the Defendants resides in the District and the unlawful practices of which Blocker complains of was committed in this District.

## COMMON ALLEGATION

17.    On April 17, 2000 Blocker was hired by the Port Authority at the Harmarville Garage as a Driver.

18.    In around 2004, Blocker was transferred to the Maintenance Department as a Service Person at the Port Authority's Collier Garage.  In that same year, Blocker was appointed to a Union Representative position for the Port Authority.

19.    In around March 2006, Blocker was transferred to the Port Authority's East Liberty Garage as a Union Representative and Maintenance Department Service Person.

20.    Shortly after Blocker was transferred to the East Liberty Garage, her co-workers in the maintenance department, who were white males, began to regularly harass and intimidate her.

21.    From the moment that Blocker began working at the East Liberty Garage, her co-workers created a racially hostile environment towards her.

22.    During the early spring of 2007, David Swetoff and Donald Irving, Caucasian men and Blocker's co-workers in the Maintenance Department at East Liberty Garage, made racist comments towards Melvin Simonson, an African-American male who worked at the East Liberty Garage in the Maintenance Department.

23.    Previously, Swetoff had made a racially offensive comment to Carlos Ervin, an African-American male employed by the Port Authority in the Maintenance Department at East Liberty Garage.   Swetoff had even falsely accused Blocker of vandalizing his vehicle.

24.    On or about September 28, 2007, a disciplinary hearing was scheduled to address allegations that Swetoff and Irving made racially offensive comments towards Simonson.

25.    Swetoff and Irving simply received a verbal counseling as discipline.

26.    The harassment towards Blocker escalated on October 1, 2007.

27.    On October 1, 2007, at around 3:50 a.m. Port Authority employees at the East Liberty Garage found a black baby doll with the racial epithet "nigger bitch" written on it hanging in front of Blocker's work area.

28.    However, on that day Blocker was not working at the East Liberty Garage because she was not scheduled to work.

29.    That same day, Tamara Clark, an employee in the maintenance department, and Bob Payne called Blocker and told her that someone hung a black doll in front of her work area with the words "nigger bitch" on it.

30.    Although the Port Authority's managers and supervisors for the East Liberty Garage were aware of the doll hanging hate crime, none of the managers and supervisors reported the hate crime to Blocker on October 1, 2007.

31.    Upon information and belief, Gatewood and Gacika knew that an employee or employees hung a doll in front of Blocker's work area, but refused to answer Blocker's phone calls when she called them on October 1, 2007 to discuss the hate crime.

32.    Instead, the following day, October 2, 2007, Gatewood, Gazica, Johnson and Dillard began spreading vicious and unfounded rumors that Blocker planted the

doll in her work area, even though Blocker was not working at the East Liberty Garage and was nowhere on the work premises on the night in question.

33.   Defendants turned over the doll to the Federal Bureau of Investigations ("FBI") for an investigation.

34.   Previously, a black doll, with a noose around its neck, had been hung in front of another African-American employee's work area at another Port Authority garage.

35.   Without any factual basis at all, Gatewood told the FBI that Blocker planted the doll with the words "nigger bitch" on it and placed it in front of her work area.

36.   Moore-McGee, Klavon, Gatewood, Johnson and Gacika informed Blocker that they would conduct their own "investigation," separate from the Port Authority Police and FBI's investigation, regarding the doll-hanging hate crime.

37.   As part of the superficial investigation, Dillard, Klavon, Gatewood and Gacika asked for writing exemplars by some of the Port Authority employees to determine if their handwriting matched the handwriting on the doll.

38.   Dillard, Klavon, Gatewood and Gacika never asked Bob Duluski, Bill Bietler, Swetoff, Tom Shetley, Gary Novak, Don Ivan and Tom Belan, Steve Massevic, all Caucasian men employed by the Port Authority in the Maintenance Department, to provide writing exemplars. These same men were working at the

East Liberty Garage during the same shift when the doll was hung outside of Blocker's work area.

39.   However, Dillard, Klavon, Gatewood and Gacika asked two African-American female employees (Joan (last name unknown) and Sharon Barry), who were not even working at the East Liberty Garage on the day the doll was hung, to provide writing exemplars. Blocker also gave a handwriting exemplar.

40.   A handwriting analyst reviewed the handwriting on the doll, but the results were allegedly inconclusive. The handwriting results were withheld from Blocker and Clark.

41.   Gatewood told the Port Authority Police that the doll-hanging was a "black crime" caused by a black person.

42.   Gatewood told the Port Authority Police that the doll-hanging was caused by a black person because she wanted to make it appear as if Blocker planted the doll.

43.   Gatewood also told representatives from the National Association for the Advancement of Colored People ("NAACP"), when they came to the East Liberty Garage to investigate the hate crime, that the hate crime was a "black crime" caused by a black person.  Gatewood prohibited the NAACP representatives from talking to any of the Port Authority employees.

44.   Moore-McGee, Klavon, Gatewood, Johnson and Gacika did not take fingerprints off the doll.

45.     The doll-hanging hate crime gained immediate local media exposure.

46.     On October 2, 2007, Blocker reported to the news media, including radio and television media, that a doll was hung in front of her work area with the words "nigger bitch" on it.

47.     Blocker also spoke out to the news media about the Port Authority's superficial and grossly inadequate investigation of the doll-hanging hate crime.

48.     Blocker also reported to the news media that the Port Authority supervisors/managers falsely and with no factual basis accused Blocker of hanging the doll in front of her work area.

49.     After the news media reported the hate crime to residents in the Pittsburgh metropolitan area, the Caucasian male co-worker's in the Maintenance Department at the East Liberty Garage escalated their harassment and abuse towards Blocker.

50.     Beginning on October 18, 2007, Duluski began a habit of throwing away Blocker's work supplies, including mops, to prevent her from performing her job.

51.     Blocker filed a formal complaint to the Port Authority's supervisory personnel, including Gatewood.

52.     Rather than discipline Duluski, who unequivocally threw away Blocker's equipment in an effort to create a hostile work environment for Blocker and to harass her, Gatewood and other Port Authority managers gave Duluski a private cabinet for him to store his items.

53.   Then, beginning on October 24, 2007, a Port Authority employee would turn off the lights in the hallway where Blocker worked, while she was working to intimidate her. This method of intimidation persisted multiple times.

54.   Blocker reported to two managers at the Port Authority, George Monroe and DeAngelis, that the employees were turning off the lights in the hallway to intimidate her.

55.   The following day, October 25, 2007, Port Authority employees, including, Swetoff, Don Ivan and Don Houser, all white males, congregated around the time clock in the maintenance office while Blocker punched in her time card at the beginning of her shift and stared at her in an attempt to intimidate her. Those same employees would continue this practice, on a regular basis, of staring at Blocker when she punched in her time card before starting her shift.

56.   Blocker found out that the Caucasian male co-workers in the maintenance department stated that they were trying to force her from the garage and they wanted to teach her a lesson.

57.   Blocker reported to DeAngelis and Klavon that the Caucasian co-workers were harassing and intimidating her when she would punch in at the beginning of her shift.

58.   Although DeAngelis and Klavon were on notice of the harassment and intimidation, they never disciplined Swetoff, Don Ivan and Don Houser for their

egregious and racially motivated behavior because Blocker is an African-American.

59. Those same Caucasian employees harassed an African-American male employee (Jerry Davis) when he came to the Maintenance Department office to speak with the foreman.

60. In the middle of October 2007, Port Authority Police Officer, Rose interviewed Blocker.

61. The FBI's investigation continued into January 2008.

62. As part their investigation, the FBI Agent Jackson and Defendant Dillard, on January 19, 2008, called Clark, at the start of her shift, into a small office for an interrogation concerning who hung up the doll. Clark had no notice of the interrogation or union representation during the process.

63. Dillard was the Port Authority police detective assigned to investigate the doll-hanging hate-crime.

64. Dillard and Jackson created a hostile intimidating environment in the interrogation room. During the interrogation, either Jackson or Dillard place his handcuffs on the table before Clark. Dillard told Clark that if she did not admit that Blocker planted the doll in her work area, then Clark hung the doll herself.

65. Jackson and/or Dillard also threatened to take away Clark's child, terminate her job or send her to jail if she did not confess to them who hung up the doll.

66.     Following two hours of interrogation and intimidation, Clark felt pressured to sign a written statement stating that Blocker knew the doll would be hung in her work area.

67.     Clark later admitted, under oath, that Blocker never told her that she knew that the doll would be hung in her work area.  Clark also admitted that she felt intimidated by Dillard and FBI Agent Jackson to sign the statement stating that she knew that the doll would be hung and Blocker had told her that it was going to be hung.

68.     On February 21, 2008 Blocker filed a charge of discrimination for harassment, retaliation and intimidation against the Port Authority with the PHRC and EEOC because the Port Authority's supervisors and employees (PHRC no. 200703631/ EEOC no. 17F200861264) falsely accused her of hanging up the black doll.

69.     In the Complaint, Blocker also alleged that her white male co-workers were intimidating and harassing her, in retaliation for reporting the hate crime to the news media, and were not disciplined. A copy of the complaint was served on the Port Authority shortly thereafter.

70.     Within days of receiving the complaint, on March 11, 2008, Dillard and Agent Jackson called Blocker into a room to meet with her.  They attempted to interrogate Blocker about the doll-hanging, but Blocker was hesitant to speak with

the FBI again because she reasonably believed that Defendants and the FBI were trying to accuse her of hanging the doll.  Dillard and Agent Jackson left the area.

71.    The FBI and Port Authority Police closed its investigation.   The Port Authority Police and FBI turned the file over to the Employee Relations Department of the Port Authority.

72.    No criminal charges were filed in connection with the investigation.

73.    Then Klavon and Wells came into the room Wells told Blocker that she was being held off for falsifying documentation.

74.    Upon information and belief, Port Authority managers, including Wells made the decision to suspend Blocker.

75.    Upon information and belief, Gatewood, Johnson, Gazica and Dillard also accused her of falsifying a document in retaliation for filing the charge of discrimination with the PHRC and for reporting to the news media the hate crime.

76.    At that meeting Wells, never identified the document that was allegedly falsified, nor did he ever tell Blocker what she lied about in the document. Consequently, it was impossible for Blocker to defend herself against the allegations.

77.    Additionally, Blocker was told at that time by Eric Wells, Director of Employee Relations, that she would receive a hearing in the following week to address the alleged falsification.

78.     However, on that same day, the Port Authority suspended Blocker and Clark with pay for fifteen months without ever having the hearing that Wells promised.

79.     Wells suspended Blocker in retaliation for filing the charge of discrimination with the PHRC and for reporting to the news media about the hate crime.

80.     Local 85, Amalgamated Transit Union ("Local 85"), Blocker's union, filed a grievance on her behalf after she was suspended with pay.

81.     On May 27, 2008, Blocker filed a second charge of discrimination with the PHRC (case no. 200705287) and EEOC (case no. 17F200862186) against the Port Authority for falsely accusing her of falsifying a statement.

82.     Blocker had a meeting/hearing on January 7, 2009 with Moore-McGee, Klavon, Gazica and Gatewood.  At that meeting, Moore-McGee told Blocker that the purpose of the meeting was to discuss the falsification of the document. Moore-McGee identified a statement that Blocker had given to the Port Authority Police in 2007.

83.     In the statement, Blocker stated that she did not know who hung up the doll. Moore-McGee, Klavon, Gazica and Gatewood said Blocker falsified the statement because Clark said that Blocker was responsible for committing the hate crime. The Port Authority did not make a decision following the meeting.

84.     A second hearing/meeting was held in February 2009 with Blocker, Moore-McGee, Gazica, Klavon and Gatewood to discuss the alleged false statement.  At

14

the end of the meeting, Moore-McGee, Gazica, Klavon and Gatewood said they would make a decision, but they did not.

85.   The Port Authority scheduled a Section 105 hearing on Blocker's grievance. A section 105 hearing was conducted on June 2, 2009.  Following the hearing, the Port Authority terminated Blocker on June 9, 2009.

86.   Moore-McGee made the decision to terminate Blocker.

87.   Blocker immediately filed a grievance with the Board of Arbitration on June 10, 2009 on the basis that she did not have a fair and impartial hearing and discipline was issued without sufficient cause.

88.   On August 31, 2009, Blocker filed a third charge of discrimination with the PHRC (case no. 200806477) and EEOC (case no. 17F200962656) alleging further retaliation  for filing the discrimination charges with the PHRC and EEOC and discharge.

89.   While Blocker was waiting for the Board of Arbitration to consider her grievance, she sent a letter to Daniel Onorato ("Onorato") requesting that he meet with her to discuss the doll-hanging hate crime, the Port Authority's investigation and retaliation against her. At all relevant time, Onorato has been employed as the Chief Executive Officer of the Allegheny County Ex. 1. Dan Onorato never responded to Blocker's letter.

90.    Pat McMahon, the President for Local 85, had a sit down meeting with Onorato and begged them to get involved into the investigation of the hate crime. Stephen G. Bland ("Bland") was present.  Bland, at all relevant times, has been employed by the Port Authority as the Chief Executive Officer.

91.    Blocker's grievance was moved to arbitration, Port Authority of Allegheny County v. Local 85, Amalgamated Transit Union, No. 09-021, Board of Arbitration.  Oral hearings on Blocker's grievance were held on December 1, 2009 and January 25, 2010.

92.    Following oral testimony and briefs by Local 85 and the Port Authority, on May 21, 2010, the Board of Arbitration arbitrator issued an opinion and order granting Blocker's grievance, reinstated her with back pay and made whole.  Ex. 2.

93.    However, because Blocker had been unlawfully suspended, she was denied opportunities for promotion.

94.    During the fifteen month period that Blocker was suspended, the Port Authority posted a position for Route Foreman on three separate occasions.

95.    Blocker was eligible for the position and would have bid for that position if she had not been suspended.  If she had bid for that position, she would have received the job because she had more seniority than the employees who ultimately received the Route Foreman position.

96.    Upon information and belief, the three employees who were hired for the Route Foreman position had less seniority than Blocker.

97.    The Route Foreman position paid more than Blocker's position as a Maintenance Service Person.

98.    On July 21, 2010, the PHRC dismissed all of Blocker's cases of discrimination against the Port Authority because the Board of Arbitration reinstated her to her former position with back pay. Significantly, the PHRC did not dismiss Blocker's cases on the merits.

99.    The PHRC issued to Blocker "right-to-sue" letters. A copy of each letter is attached as Exhibit 3.

100.    On December 1, 2010 and February 9, 2011, the EEOC issued to Blocker "right-to-sue" letters. A copy of each letter is attached as Exhibit 4.

101.    Blocker's co-workers continue to harass and intimidate her on a daily basis because she is African-American and in retaliation for reporting the hate crime to the news media and filing racial discrimination charges with the PHRC.

102.    Blocker has reported the harassment, intimidation and abuse to her supervisors, including DeAngelis and Klavon and Defendants are aware of the harassment, but have refused to stop the harassment because she is African-American and filed discrimination charges with the PHRC.

103.   Throughout her time of employment for the Port Authority, Blocker has satisfactorily performed her job duties.

104.   The Port Authority, Moore-McGee, Klavon, Gatewood, Johnson and Gacika never conducted a proper investigation into the hate crime because Blocker is African-American and in retaliation for filing discrimination charges with the PHRC.

105.   All of the above actions towards Blocker were so severe and pervasive that Defendants created a hostile and degrading work environment for Blocker. Blocker was intentionally subjected to a degrading and hostile work environment because she is African-American.

## COUNT I

### Race Discrimination in Violation of Title VII of
### The Civil Rights Act, 42 U.S.C. § 2000e, et. seq.
*Blocker v. Port Authority*

106.   Paragraphs 1 through 105 are incorporated herein by reference as if fully set forth at length.

107.   Blocker is a member of a protected class (African-American).

108.   Defendant, Port Authority, through its respective agents, officers, managers/supervisors, employees and officials as stated above subjected Blocker to adverse employment action including:

a.      A co-worker hanging a black doll, a hate crime, with the word "nigger bitch" in her work area;

b.      Managers and supervisors conducting an unwarranted investigation against Blocker in connection with the hate crime for the sole purpose to harass and intimidate her,

c.      Managers and supervisors failure to reasonably and properly investigate the hate crime;

d.      Managers and supervisors intimidating fellow employees to lie about who committed the hate crime so as to blame Blocker for the hate crime and spreading false rumors that Blocker committed the hate crime and falsified a document;

e.      Managers and supervisor's failure to take prompt and remedial action to discipline similarly situated Caucasian employees;

f.      Retaliation for filing a charge of discrimination with the PHRC (case no. 200703631) and reporting to the news media about the hate crime;

g.      daily intimidation and harassment by co-workers, managers and supervisors;

h.      Managers and supervisors failure to take reasonable measures to prevent and promptly remedy the racially hostile environment;

i.      Depriving Blocker of promotional opportunities; and

j.    Suspending and terminating Blocker for discriminatory reasons.

109.  Similarly situated Caucasian employees were treated more favorably and differently than Blocker.

110.  Defendant subjected Blocker to adverse employment action because of her race in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq.

111.  Defendant's violations of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq. were wanton, willful and malicious.

112.  As a direct and proximate result of Defendant's willful violations of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq., Blocker has suffered damages, including loss of reputation, pay, benefits, loss of future income and growth opportunities, damage to her career, emotional distress, loss of happiness and well-being, and other compensatory damages.

113.  As the acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Blocker's well-being, thereby entitling her to punitive damages.

114.  Thus, Defendant is liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT II

### Race Discrimination in Violation of the Pennsylvania Human Relations Act, 43 Pa.C.S.A. 951, et. seq.
*Blocker v. Port Authority, Dillard, Moore-McGee, Gacika, DeAngelis, Gatewood and Klavon*

115.   Paragraphs 1 through 114 are incorporated herein by reference as if fully set forth at length.

116.   Blocker is a member of a protected class (African-American).

117.   Defendant, Port Authority, through its respective agents, officers, managers/supervisors, employees and officials as stated above subjected Blocker to adverse employment action including:

a.      A co-worker hanging a black doll, a hate crime, with the word "nigger bitch" in her work area;

b.      Managers and supervisors conducting an unwarranted investigation against Blocker in connection with the hate crime for the sole purpose to harass and intimidate her,

c.      Managers and supervisors failuring to reasonably and properly investigate the hate crime;

d.      Managers and supervisors intimidating fellow employees to lie about who committed the hate crime so as to blame Blocker for the hate crime and spreading false rumors that Blocker committed the hate crime and falsified a document;

e.     Managers and supervisor's failing to take prompt and remedial action to discipline similarly situated Caucasian employees;

f.     Retaliation for filing a charge of discrimination with the PHRC (case no. 200703631) and reporting to the news media about the hate crime;

g.     daily intimidation and harassment by co-workers, managers and supervisors;

h.     Managers and supervisors failing to take reasonable measures to prevent and promptly remedy the racially hostile environment;

i.     Depriving Blocker of promotional opportunities; and

j.     Suspending and terminating Blocker for discriminatory reasons.

118.  Similarly situated Caucasian employees were treated more favorably and differently than Blocker.

119.  Moore-McGee, Gacika, DeAngelis, Gatewood and Klavon directly aided and abetted discriminatory action by Blocker's co-workers by failing to take reasonable measures to prevent and promptly remedy the racially hostile environment.

120.  Dillard, Moore-McGee, Gacika, DeAngelis, Gatewood and Klavon incited and compelled discriminatory action against Blocker by failing to properly investigate the hate crime; falsely blaming Blocker for hanging the doll, falsely accusing her of writing a false statement; suspending and terminating Blocker,

and/or failing to take reasonable measures to remedy the racially hostile work environment.

121. Therefore, Defendants discriminated against Blocker on the basis of her race in violation of Pennsylvania Human Relations Act.

122. Defendants' violations of the Pennsylvania Human Relations Act were wanton, willful and malicious.

123. As a direct and proximate result of Defendants' willful violations of the Pennsylvania Human Relations Act Blocker has suffered damages, including emotional distress, loss of reputation, pay, benefits, loss of future income and growth opportunities, damage to her career, emotional distress, loss of happiness and well-being, and other compensatory damages.

124. As the acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Blocker's well-being, thereby entitling her to punitive damages.

125. Thus, Defendants are liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT III

### Race Discrimination in Violation of Title VII of
### The Civil Rights Act, 42 U.S.C. § 2000e, et. seq.
### Hostile Work Environment
*Blocker v. Port Authority*

126.   Paragraphs 1 through 125 are incorporated herein by reference as if fully set forth at length.

127.   Blocker is a member of a protected class (African-American).

128.   Blocker was subjected to a degrading and hostile work environment.

129.   Defendant, Port Authority, through its respective agents, officers, managers/supervisors, employees and officials as stated above subjected Blocker to acts creating the hostile work environment, include but are not limited to:

   a.      A co-worker hanging a black doll, a hate crime, with the word "nigger bitch" in her work area;

   b.      Managers and supervisors conducting an unwarranted investigation against Blocker in connection with the hate crime for the sole purpose to harass and intimidate her,

   c.      Managers and supervisors failure to reasonably and properly investigate the hate crime;

   d.      Managers and supervisors intimidating fellow employees to lie about who committed the hate crime so as to blame Blocker for the hate crime and

spreading false rumors that Blocker committed the hate crime and falsified a document;

    e.    Managers and supervisor's failure to take prompt and remedial action to discipline similarly situated Caucasian employees;

    f.    Retaliation for filing a charge of discrimination with the PHRC (case no. 200703631) and reporting to the news media about the hate crime;

    g.    daily intimidation and harassment by co-workers, managers and supervisors;

    h.    Managers and supervisors failure to take reasonable measures to prevent and promptly remedy the racially hostile environment;

    i.    Depriving Blocker of promotional opportunities; and

    j.    Suspending and terminating Blocker for discriminatory reasons.

130.   The acts creating the hostile work environment were severe and pervasive.

131.   Similarly situated Caucasian employees were not subjected to a hostile work environment.

132.   Therefore, Defendant discriminated against Blocker on the basis of her race in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq.

133.   Defendant's violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq. were wanton, willful and malicious.

134.   As a direct and proximate result of Defendant's willful violations of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq., Blocker has suffered damages, including loss of reputation, pay, benefits, loss of future income and growth opportunities, damage to her career, emotional distress, loss of happiness and well-being, and other compensatory damages.

135.   As the acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Blocker's well-being, thereby entitling her to punitive damages.

136.   Thus, Defendant is liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT IV

**Race Discrimination in Violation of the Pennsylvania
Human Relations Act, 43 Pa.C.S.A. 951, et. seq.
Hostile Work Environment**
*Blocker v. Port Authority, Dillard, Moore-McGee,
Gacika, DeAngelis, Gatewood and Klavon*

137.   Paragraphs 1 through 136 are incorporated herein by reference as if fully set forth at length.

138.   Blocker is a member of a protected class (African-American).

139.   Blocker was subjected to a degrading and hostile work environment.

140.   Some of the acts creating the hostile work environment, include but are not limited to:

26

b.    Managers and supervisors conducting an unwarranted investigation against Blocker in connection with the hate crime for the sole purpose to harass and intimidate her,

c.    Managers and supervisors failure to reasonably and properly investigate the hate crime;

d.    Managers and supervisors intimidating fellow employees to lie about who committed the hate crime so as to blame Blocker for the hate crime and spreading false rumors that Blocker committed the hate crime and falsified a document;

e.    Managers and supervisor's failure to take prompt and remedial action to discipline similarly situated Caucasian employees;

f.    Retaliation for filing a charge of discrimination with the PHRC (case no. 200703631) and reporting to the news media about the hate crime;

g.    daily intimidation and harassment by co-workers, managers and supervisors;

h.    Managers and supervisors failure to take reasonable measures to prevent and promptly remedy the racially hostile environment;

i.    Depriving Blocker of promotional opportunities; and

j.    Suspending and terminating Blocker for discriminatory reasons.

141.   Similarly situated Caucasian employees were treated more favorably and differently than Blocker.

142.   Moore-McGee, Gacika, DeAngelis, Gatewood and Klavon directly aided and abetted discriminatory action by Blocker's co-workers by failing to take reasonable measures to prevent and promptly remedy the racially hostile environment.

143.   Dillard, Moore-McGee, Gacika, DeAngelis, Gatewood and Klavon incited and compelled discriminatory action against Blocker by failing to properly investigate the hate crime; falsely blaming Blocker for hanging the doll, falsely accusing her of writing a false statement, retaliating against Blocker for filing charges of discrimination with the PHRC suspending and terminating Blocker, and/or failing to take reasonable measures to remedy the racially hostile work environment.

144.   Therefore, Defendants discriminated against Blocker on the basis of her race by creating a hostile work environment in violation of Pennsylvania Human Relations Act.

145.   Defendants' violations of the Pennsylvania Human Relations Act were wanton, willful and malicious.

146.   As a direct and proximate result of Defendants' willful violations of the Pennsylvania Human Relations Act Blocker has suffered damages, including

emotional distress, loss of reputation, pay, benefits, loss of future income and growth opportunities, damage to her career, emotional distress, loss of happiness and well-being, and other compensatory damages.

147.   As the acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Blocker's well-being, thereby entitling her to punitive damages.

148.   Thus, Defendants are liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT V

**Violation of 42 U.S.C. § 1981**
*Blocker v. Dillard, Moore-McGee, Johnson, Wells,*
*Gacika, DeAngelis, Gatewood and Klavon*

149.   Paragraphs 1 through 148 are incorporated herein by reference as if fully set forth at length.

150.   Blocker is a member of a protected class-African- American.

151.   Defendants' intentional racially discriminatory conduct, as stated above, created a hostile work environment and deprived Blocker of an equal right to the making, performance, modification and termination of her at will employment contract, and to the benefits, privileges, terms and conditions of said contractual relationship.

152. By Defendants' actions complained of, Defendants have intentionally denied under color of state law and in violation of 42 U.S.C. § 1981.

153. Defendants racial discrimination towards Blocker was carried out with malice and/or reckless indifference to federally protected rights.

154. As a direct and proximate result of Defendants' willful violations 42 U.S.C. § 1981, Blocker has suffered damages, including emotional distress, loss of reputation, pay, benefits, loss of future income and growth opportunities, damage to her career and loss of happiness and well-being, and other compensatory damages.

155. As the acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Blocker's well-being, thereby entitling her to punitive damages.

156. Thus, Defendants willfully violated 42 U.S.C. § 1981, when they discriminated against Blocker on the basis of her race.

157. Thus, Defendants are liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT VI

**Violation of 42 U.S.C. § 1983**
*Blocker v. Dillard, Moore-McGee, Johnson, Wells,*
*Gacika, DeAngelis, Gatewood and Klavon*

158.  Paragraphs 1 through 157 are incorporated herein by reference as if fully set forth at length.

159.  The acts and conduct of Defendants, while acting under color of state law, as stated below violated Blocker's rights privileges and immunities guaranteed under federal law and the U.S. Constitution:

a.    Conducting an unwarranted investigation against Blocker in connection with the hate crime for the sole purpose to harass and intimidate her,

c.    Failing to reasonably and properly investigate the hate crime;

d.    Intimidating fellow employees to lie about who committed the hate crime so as to blame Blocker for the hate crime; and spreading false rumors that Blocker committed the hate crime and falsified a document;

e.    Failure to take prompt and remedial action to discipline similarly situated Caucasian employees;

f.    Retaliation for filing a charge of discrimination with the PHRC (case no. 200703631) and reporting to the news media about the hate crime;

31

g.    Failure to take reasonable measures to prevent and remedy the daily intimidation and harassment by co-workers, managers and supervisors against Blocker;

h.    Depriving Blocker of promotional opportunities; and

j.    Suspending and terminating Blocker for discriminatory reasons.

160.  As a direct and proximate result of Defendants' willful violations 42 U.S.C. § 1981, Blocker has suffered damages, including emotional distress, loss of reputation, pay, benefits, loss of future income and growth opportunities, damage to her career and loss of happiness and well-being, and other compensatory damages.

161.  As the acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Blocker's well-being, thereby entitling her to punitive damages.

162.  Thus, Defendants willfully violated 42 U.S.C. § 1981, when they discriminated against Blocker on the basis of her race.

163.  Thus, Defendants are liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## COUNT VII

### Intentional Infliction of Emotional Distress
*Blocker  v. Port Authority of Allegheny County,*
*Gatewood, Gazica, Johnson, Dillard, Moore-McGee, Wells and Klavon*

164.   Paragraphs 1 through 163 are incorporated herein by reference as if fully set forth at length.

165.   Defendants intended to cause or knew or should have known that the actions taken would result in serious emotional distress to Blocker.

166.   That Defendants' conduct was so extreme and outrageous as to go beyond the bounds of decency and intolerable in a civilized community.

167.   That Defendants' actions were the proximate cause of Blocker's emotional injury.

168.   That mental anguish suffered by Blocker is serious and of a nature that no reasonable person could be expected to endure it.

    a.   extreme and outrageous conduct,

    b.   conduct that is intentional or reckless,

    c.   conduct which has caused severe emotional distress.

169.   Thus, Defendants are liable to Blocker for compensatory and punitive damages, along with attorneys' fees and costs.

## PRAYER FOR RELIEF (All Counts)

**WHEREFORE**, Blocker respectfully requests that this Court enter judgment in his favor and against all Defendants and direct the following relief:

a.   for a judgment declaring Defendants violated Title VII of the Civil Rights Act; 42 U.S.C. § 1981; 42 U.S.C. § 1983; and the Pennsylvania Human Relations Act; and intentionally inflicted emotional distress.

b.   grant a permanent injunction enjoining Defendants, their officers, successors, employees and all persons in active concert or participation with them from engaging in employment actions or practices which discriminate against Blocker;

c.   for a money judgment representing nominal and compensatory damages including lost wages, seniority she lost as a result of the unlawful discrimination, emotional pain and suffering, and all other sums of money, including retirement benefits and other employment benefits, together with interest thereon;

d.   for a money judgment for nominal and compensatory damages for creating, permitting and continuing discrimination against Blocker, including compensation for the distress that arises from being the target and victim of unlawful discriminatory conduct;

e. for a money judgment representing nominal, compensatory, and punitive damages for the Defendants' willful violations of Title VII of the Civil Rights Act; 42 U.S.C. §§ 1981, 1983; and the Pennsylvania Human Relations Act;

f. for a money judgment representing prejudgment interest;

g. for the costs of the suit, including an award of reasonable attorneys' fees;

h. that Defendants pay punitive damages to Blocker; and

i. that Blocker be awarded such further relief as this Court finds just and proper.

## JURY DEMAND

Blocker hereby requests a jury trial on all issues.

Respectfully submitted,

**ROBINSON & GERALDO**

Dated:  April 18, 2011

By:s/ Tiffany L. Robinson
Tiffany L. Robinson, Esq.
Attorney ID No. 207375
Attorney for Plaintiff
2505 North Front Street
P.O. Box 5320
Harrisburg, Pennsylvania 17110-5320
(717) 232-8525 - Phone
trobinson@robinson-geraldo.com

**VERIFICATION**

I verify that the statements made in the Complaint are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. section 4904, relating to unsworn falsification to authorities.

_Deborah Blocker_
Deborah Blocker